## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

BRIAN O'NEAL STEGER,          )
                               )
            Plaintiff,         )
                               )
vs.                            )     Case no: 5:12-cv-03918-VEH-JEO
                               )
AGENT JULIAN JOHNSON, et al.,  )
                               )
            Defendants.        )

## REPORT AND RECOMMENDATION

Plaintiff, Brian O'Neal Steger, filed this *pro se* action pursuant to 42 U.S.C. §
1983, alleging constitutional and state law claims related to an August 14, 2011, arrest
in Madison County Alabama.  He names Agents Julian Johnson and Jamar Miles as
defendants, and seeks a jury trial, as well as compensatory and punitive damages.
(Doc. 1 at 9-10).  In accordance with the usual practices of this court and 28 U.S.C.
§ 636(b)(2), the complaint was referred to the undersigned magistrate judge for a
preliminary report and recommendation.  *See McCarthy v. Bronson*, 500 U.S. 136
(1991).

### I.  Procedural History

On July 1, 2013, the court entered an Order for Special Report directing that
a copy of the complaint in this action be forwarded to defendants Julian Johnson and
Jamar Miles and requesting that they file special reports addressing the factual

allegations of the plaintiff's complaint. (Doc. 12). The defendants were advised that the special report could be submitted under oath or accompanied by affidavits and, if appropriate, would be considered as motions for summary judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. By the same Order, the plaintiff was advised that after he received copies of the special reports submitted by the defendants he should file counter affidavits if he wished to rebut the matters presented by the defendants in the special report. Steger was further advised that such affidavits should be filed within twenty days after receiving copies of the defendants' special reports.

On August 29, 2013, and August 30, 2013, respectively, defendants Jamar Miles and Julian Johnson filed special reports accompanied by exhibits and affidavits. (Docs. 18 & 20). On October 10, 2013, the plaintiff filed an objection to the special reports. (Doc. 21). On December 20, 2013, and January 23, 2014, respectively, defendants Miles and Johnson filed reply briefs. (Docs. 25 & 27).[1]

On December 8, 2014, the plaintiff was notified that he would have twenty days to respond to the motions for summary judgment, filing affidavits or other material if he chose. (Doc. 34). He also was advised of the consequences of any

---

[1] On February 5, 2014, the case was stayed because defendant Jamar Miles was on active duty with the Department of the Army. (Doc. 30). The stay was lifted on November 26, 2014. (Doc. 32).

default or failure to comply with Fed. R. Civ. P. 56.  *See Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).  The plaintiff requested, and was granted, additional time to file a response, but none has been filed.

## II.  Summary Judgment Standard

Because the special reports of the defendants are being considered motions for summary judgment, the court must determine whether the moving parties, the defendants, are entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.  *Federal Rule of Civil Procedure 56.*  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving parties. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  The burden of proof is upon a moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law.  *See Clark v. Coats & Clark, Inc*., 929 F.2d 604 (11th Cir. 1991).  Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989).  Unless the

3

plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial, and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." [citations omitted]. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

898 F.2d at 1532.

## III. Claims

The plaintiff claims defendants Johnson and Miles subjected him to excessive force, assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress. (Doc. 1 at 9). He contends that

> [b]ecause of the assault and battery and use of excessive force against the Plaintiff; he has suffered permanent, severe, and continuing injuries, including but not limited to, missing teeth, injuries to his knee and wrist and big toe, physical and psychological trauma, slurred speech, severe mental anguish, emotional distress, post-traumatic stress disorder, and loss of enjoyment of life.

4

(*Id.*).  He sues defendants Johnson and Miles in their official and individual capacities and demands compensatory and punitive damages.  (*Id.*).

### III.  Summary Judgment Facts

#### A.    The Assault

Applying the appropriate summary judgment standard to the facts before the court, the following facts are undisputed or, if disputed, are taken in a light most favorable to the plaintiff.  On April 13, 2011, the plaintiff, a parolee, was sitting at a table at a "'shothouse'"[2] backyard party in Huntsville, Alabama.  (Doc. 1 at 7; Doc. 20-3 at 12-13).  There were approximately 30 people in the backyard.  (Doc. 20-1 at 3).   Agents Johnson and Miles, wearing plain clothes and marked police vests, approached the party.  (*Id.* at 4).  When Johnson asked what the plaintiff had in his hand, he "untruthfully replied 'Nothing,' and then . . . dropped [a] bag of marijuana on the ground."  (*Id.*).  Johnson told the plaintiff he "knew [the plaintiff dropped] a bag of marijuana."  (*Id.*).

The plaintiff "got[] up from the table where he had been sitting" to walk "to the store – when he heard someone yell out: "'He's got a gun[,]'" so the plaintiff "started walking faster[.]'"  (Doc. 1 at 7).[3]  Then "[o]ne of the two men . . . . ran towards [him]

---

[2] A shothouse is a "location known for the illegal sale of alcohol."  (Doc. 20-1 at 3).

[3] Johnson attests he "reached out to handcuff the plaintiff," but just as he did, the plaintiff "flipped his chair and the table over" and "began running."  (Doc. 20-1 at 4).  As the plaintiff was

and tackled him from behind." (*Id.*).[4]  Although the plaintiff "did not resist or put up

a struggle[,]" while handcuffed on the ground, the man "began hitting" the plaintiff

"with his fists in the face, mouth and . . .  body [and] drove [the plaintiff's] knee into

the ground." (*Id.* at 7-8).  The man did not announce he was a police officer, but the

plaintiff later discovered he was defendant Johnson. (*Id.* at 7).  Officer Jamar Miles

also "joined Johnson in beating up" the plaintiff and did not stop Johnson. (*Id.* at 8).[5]

The plaintiff claims the assault caused two of his gold teeth to fall out, injured

---

running, he

> looked back at [Johnson], as if to see how close behind him we were.  When he did
> so, he ran full speed straight into the side of a vehicle that was parked in the yard of
> the residence.  Steger had a strong athletic build and was running fast, so when he
> slammed into the vehicle it actually caused the vehicle to rock back and forth due to
> the significant impact.

(Doc. 20-1 at 5).  The plaintiff "rolled off the hood onto the ground," and continued to run "toward
a wooded area." (*Id.*).  Officer Miles echoes these events. (Doc. 20-2 at 3-4).

[4] When the plaintiff tripped on some brush, Officer Miles was able to catch up to him and
"tackle him to the ground." (Doc. 20-2 at 4).  The plaintiff was "face down" and Miles put his body
on top of the plaintiff to restrain him. (*Id.*).  Miles lost his handcuffs during the chase, so he held
the plaintiff until Johnson caught up and was able to handcuff him. (*Id.*).  Although the plaintiff "did
not struggle heavily . . . , he also did not succumb to restraint willingly," so some amount of force
was required. (*Id.* at 5).  Johnson positioned himself on the plaintiff as well to restrain him because
the plaintiff was using "his hands to push himself off the ground[,] and would not give [Johnson]
his hands to be handcuffed right away." (Doc. 20-1 at 5).  The plaintiff repeatedly asked what he had
done, and Johnson stated he saw the plaintiff "throw marijuana on the ground." (*Id.* at 6).  The
plaintiff was then placed in a patrol car. (*Id.*).

[5] Johnson and Miles attest that the plaintiff was not hit or punched, that there was no sign of
any visible injury to the plaintiff, and that he did not request any medical attention. (*Id.* at 6-7; Doc.
20-2 at 5-6).

6

his big toe, and injured his wrist and knee to the point he now has a "built up mass of cartilage" on both.  (*Id.* at 8).  While on the way to Metro Jail, the plaintiff asked Officer Johnson to loosen the handcuffs because his hands were getting numb, but Johnson refused.  (*Id.*).[6]

> In a subsequent affidavit, the plaintiff alleges he was
>
> walking through the backyard at a gathering . . . on [his] way to the store when [he] was jumped from behind by a short bald guy (Julian Johnson)[. W]hile on the ground his partner (Jamar Miles) came and put his knee on my neck, while Officer Johnson cuffed me.  They both were asking me what I had.  I told them nothing, and that[']s when Officer Johnson hit me three (sic) shots to the ribs and two shots to the mouth.  Officer Johnson snatched me from the ground by the cuffs and took me to a police car where I remained until I was transported to jail.  I was bleeding, my hands [were] numb, and my knee had a numb, burning tingling feel.

(Doc. 21 at 8).

Reginald Alan Jones and David Lee Whitaker witnessed the incident.  (*Id.* at 6-7).  Jones attests he and his "friends were sitting on the hood of [his] car about 10 to 15 feet away" from where the assault occurred.  (*Id.* at 6).  Jones saw the plaintiff "walking when he was jumped from behind by a short bald man wearing a maroon shirt and jeans.  While on the ground [the plaintiff] was cuffed and punched a number of times to the ribs and face."  (*Id.*).  "[W]hile this was happening the other guy

---

[6] Johnson attests the plaintiff made no complaints in the patrol car.  (Doc. 20-1 at 6-7).

7

wearing a yellow shirt jumped on to [the plaintiff's] head and neck.  Then the bald

short guy pulled the plaintiff from the ground by the cuffs and took him to the police

car." (*Id.*).  Whitaker echoes Jones's statement, and asserts the plaintiff "didn't resist

arrest or nothing." (*Id.* at 7).

## B.     Post-Arrest

After his arrest, the plaintiff was taken to Madison County Jail and charged

with Possession of Marijuana First Degree.  (Doc. 20-3 at 6).  The plaintiff does not

dispute that "[d]uring his booking, [he] admitted [to Johnson] that he had run from

[Johnson and Miles] because of the marijuana." (Doc. 20-1 at 6).

During intake, the plaintiff signed a medical history review form stating that

he had "answered all questions truthfully[,]" on the form, that he had "been told and

shown how to obtain medical services," and that he consented to the health services

of "Advanced Correctional + HealthCare." (Doc. 20-3 at 63).  The plaintiff reported

no recent medical injuries nor were "Wounds Present." (*Id.* at 62).  Nurse Baker co-

signed the review. (*Id.* at 63).  On the dental screening form, it was noted that the

general condition of the plaintiff's teeth and gums were good, with the exception of

the "top #8 tooth [, which was] loose[,]" and a tear to the gum above that tooth. (*Id.*

at 64).  He was referred to the dentist for the loose tooth and torn gum. (*Id.* at 66).

On an "Arrestee Screening Instrument," also signed by the plaintiff on the day of his

arrest, he answered "No" when asked if he had "a serious medical condition . . . that may require medical attention[,]" and "Yes" when asked if he understood that he could request medical attention if needed.  (*Id.* at 25).[7]

Inmate Tory Elliott attests he saw the plaintiff the day he was arrested, and that the plaintiff seemed to be limping, two of his front teeth were loose, and "one of his knees and one of his wrist[s] . . . were swollen badly." (Doc. 1 at 13).  Later, one of the plaintiff's teeth fell out.  (*Id.*).

Three days later, on April 16, 2011, inmate Richard Smith noticed the plaintiff had a missing tooth.  (*Id.* at 11).  The plaintiff was upset as he explained how the injury occurred and showed Smith his wrists, "which were both swollen and cut up[.]"  (*Id.* at 12).  Further, the plaintiff's "ribs on his right side . . . were badly bruised, and his right knee was swollen." (*Id.*).  Smith recalled the plaintiff "asking for medical attention several times while in (P-1) unit[,] but [he] was never given any." (*Id.*).  Smith also witnessed the plaintiff lose a second gold tooth.  (*Id.*).

There are no notations that the plaintiff requested any medical assistance from the nurse for any injuries nor are there any corroborating medical records.  However, on April 22, 2011, the plaintiff did make the following request:

---

[7] Defendant Johnson also reported no "medical condition . . . or injury recently sustained by" the plaintiff on the "Madison County Detention Facility Booking Assessment Instrument."  (*Id.* at 26).

> Upon being arrested a[n] Officer knocked out two teeth . . . by hitting me in the mouth. They are gold teeth. I need to send them home. My family has already returned to the jail and picked up all of my belongings. Can I turn the teeth in to someone and . . . be put in my property where some[one] can come and get them.

(Doc. 20-3 at 38). The plaintiff was instructed that he could give the teeth to medical staff and his family could pick them up. (*Id.*).

On May 11, 2011, the plaintiff was placed on dental call for an appointment with Dr. Woods. (*Id.* at 51 & 54). However, the notations show that he "Refused Dentist." (*Id.* at 60). During the same month, the plaintiff twice requested to be placed in the honor dorm, and to be assigned kitchen and laundry duty. (*Id.* at 40, 42). On May 19, 2011, Cpl. Williams recommended the plaintiff be placed on trusty status, and approved him for "Road Crew/Detention Facility Duty," pending the "results of [a] PPD [test]." (*Id.* at 47).[8] On June 2, 2011, the plaintiff again requested honor dorm placement, and laundry or kitchen duty. (*Id.* at 43). Officer Miller responded that the plaintiff would be considered once he was "medically cleared." (*Id.*). On June 3, 2011, he was removed from trusty status for two weeks because he received a disciplinary infraction. (*Id.* at 34-35).

He also made numerous requests pertaining to religious material, legal

---

[8] A PPD, or "purified protein derivative" test, is a skin test to determine tuberculosis. http://www.merckmanuals.com/professional/infectious_diseases/mycobacteria/tuberculosis.

proceedings and his inmate trust account while incarcerated at the jail.  (*Id.* at 37, 39

41, 44-46).  There are no requests for medical attention in the jail records.  While it

is accepted that the officers refused to take his forms or he received no response, the

plaintiff does not state when or how often he requested medical attention, and does

not reveal why he needed medical attention on a particular date.

      During his incarceration the plaintiff was indicted for Possession of Marijuana

First Degree, and on September 13, 2012, he pled guilty to an amended charge of

Possession of Marijuana Second Degree.  (*Id.* at 9).  He received a 12 month

sentence, and was given jail credit "for any time served while waiting for trial since

April 13, 2011."  (*Id*).

## IV.  Analysis

### A.   Fourth Amendment Excessive Force

      Defendants Johnson and Miles argue they are entitled to qualified immunity

from the plaintiff's claims because their conduct did not violate any clearly

established laws.  (Docs. 18 & 20).  In determining whether the amount of force used

by an arresting officer was excessive, a court must apply a Fourth Amendment to

determine whether the challenged arrest was reasonable under the circumstances.

*Graham v. Connor*, 490 U.S. 386, 395 (1989).  The standard requires a court to

determine "whether the officers' actions are 'objectively reasonable' in light of the

facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397.  This objective test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  "An officer will be entitled to qualified immunity if his actions were 'objectively reasonable' – that is, if a reasonable officer in the same situation would have believed that the force used was not excessive." *Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998)(citing *Anderson v. Creighton*, 483 U.S. 635 (1987)).  *See also Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) ("[Q]ualified immunity applies unless application of the standard would inevitably lead every reasonable officer in [the defendant officer's] position to conclude the force was unlawful.").

### 1.    The initial takedown

Johnson's initial "[u]se of force [is] judged . . . 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting *Graham*, 490 U.S. at 394).  "Moreover, Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right

to use some degree of physical coercion or threat thereof to effect it." *Lee v. Ferrero*, 284 F.3d 1188, 1197 (11th Cir. 2002) (citing *Graham*, 490 U.S. at 396) (in turn citing *Terry v. Ohio*, 392 U.S. 1, 22–27 (1968)).

The plaintiff was congregating with a large number of individuals in an area known for illegal activity. (Doc. 20-3 at 12-13). The plaintiff does not deny that he dropped marijuana on the ground in full view of defendant Johnson, and does not dispute he later told defendant Johnson that he ran from the defendants because of the marijuana. (Doc. 20-1 at 3-4). These circumstances led defendant Johnson to pursue and tackle the plaintiff in order to effectuate an arrest. The plaintiff has not specifically refuted the defendants' assertion that he ran into a car while fleeing the party, and then continued to flee because of the marijuana.[9] Indeed, the plaintiff's parole was revoked because of the charge, and he ultimately pled guilty to misdemeanor marijuana possession. (Doc. 20-3 at 9). The totality of these circumstances shows that Johnson's actions were objectively reasonable. *See Graham*, 490 U.S. at 397 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.").

---

[9] *See supra*, n. 3.

The plaintiff does not point to any specific injury he sustained as a result of the tackle, and does not explain what portion of his purported injuries is attributable to his run in with a car. At best, the take down and Johnson's act of laying on him might relate to the plaintiff's assertion that Johnson dug his knee into the ground, which gave it a numb, burning and tingling feeling. (Doc. 21 at 8). Thereafter, the knee was tender and swollen for several days. (*Id.* at 6-7). He conclusorily asserts that now has a "built up mass of cartilage" on the knee. (Doc. 1 at 8).

Still, the injury was not significant enough for the plaintiff to report it to medical personnel when he was booked into the jail. It also did not quell the plaintiff's desire and ability to be placed on kitchen and laundry duty, or prevent him from being placed on trusty status and approved for road crew work. The extent of the plaintiff's knee injury does not show the amount of force used by Johnson was "[un]reasonably [dis]proportionate to the need for that force, which is measured by the severity of the crime, the danger to [him], and the risk of flight [by the plaintiff]." *Lee v. Ferraro*, 284 F.3d at 1198. Accordingly, to the extent defendant Johnson pursued and took down the plaintiff, his motion for summary judgment is due to be granted.

**2.    After the takedown**

The plaintiff and two eyewitnesses assert he engaged in no resistance after

14

defendant Johnson tackled and laid on top of him.  (Doc. 1 at 7-8; Doc. 21 at 6-7).

The plaintiff alleges Officer Miles then approached, and put his knee on the

plaintiff's neck while Officer Johnson cuffed the plaintiff.  (Doc. 21 at 8).  When the

officers asked him "w[hat] he had," the plaintiff replied, "nothing."  (*Id.*).  At that

point, "Officer Johnson hit" him in the ribs three times and in the mouth two times.

(*Id.*).  As a result, the plaintiff's ribs were bruised and two of his front teeth were

loosened and fell out soon thereafter.  (Doc. 1 at 8, 11-13).

### a.   Officer Johnson

Since the plaintiff did not resist defendant Johnson after he was tackled and

handcuffed, no "further force was needed" at that point.   *Post v. City of Fort

Lauderdale*, 7 F.3d at 1559.  Several Eleventh Circuit cases "hold that gratuitous use

of force when a criminal suspect is not resisting arrest constitutes excessive force."

*Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) (finding excessive force

when officer "punched plaintiff in the stomach when he was handcuffed and not

struggling or resisting"); *Lee v. Ferraro*, 284 F.3d at 1198 (excessive force used by

defendant officer who slammed the plaintiff head on the dash of his patrol after

arresting her without incident for honking her car horn).

There are genuine issues of disputed fact from which a fact-finder could

determine defendant Johnson gratuitously hit the plaintiff's mouth and ribs while he

lay compliantly handcuffed on the ground.  Moreover, the Eleventh Circuit cases cited in the previous paragraph show that on April 13, 2011, clearly established law gave defendant Johnson fair notice that needlessly punching a subdued arrestee violates the Fourth Amendment.  Accordingly, to the extent the plaintiff alleges defendant Johnson subjected him to excessive force after he was handcuffed, defendant Johnson's motion for summary judgment is due to be denied.

### b.  Officer Miles

The plaintiff also blames defendant Miles, but does not allege that Miles actually assaulted him in any manner.  Instead, Miles held the plaintiff secure while defendant Johnson handcuffed him.  (Doc. 21 at 8).  The plaintiff provides no facts from which this court could determine that defendant Miles was aware defendant Johnson intended to punch the plaintiff once he was handcuffed.  Thus, the plaintiff's theory of liability against defendant Miles is focused on Miles's failure to intervene when defendant Johnson began punching the plaintiff.

> "[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2007) (quoting *Skrtich v. Thornton*, 280 F.3d 1295, 1302 (11th Cir. 2002)) (quotation marks omitted).  But it must also be true that the non-intervening officer was in a position to intervene yet failed to do so.  *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000).

*Hadley v. Gutierrez*, 526 F.3d 1324, 1330-1331 (11th Cir. 2008).

Since the facts do not establish defendant Miles had prior knowledge of defendant Johnson's intentions, the plaintiff has not met his burden to establish a genuine dispute regarding whether Miles should have intervened in the plaintiff's behalf when Johnson punched the plaintiff the first time.   However, given that Miles's knee was on the plaintiff's neck at the time, there is a genuine dispute as to whether Miles "joined . . . in [the] beating" when Johnson continued to punch the plaintiff, in violation of his Fourth Amendment constitutional rights.   The law assigning liability to a defendant who fails to intervene under such circumstances was clearly established at the time the plaintiff was punched, and as such defendant Miles is not entitled to qualified immunity.   *See supra  Hadley v. Gutierrez*, 526 F.3d at 1330-1331.   Accordingly, defendant Miles's motion for summary judgment is due to be denied.

### 3.    Painful Handcuffing

The plaintiff alleges that while being transported to jail, he asked defendant Johnson to loosen his handcuffs because his hands were numb, but Johnson refused. (Doc. 1 at 8).   However, the plaintiff did not complain his wrists were injured when he was being processed into the jail, nor did medical personnel observe any injury. (Doc. 20-3 at 62-63).   The day of the arrest, the plaintiff's fellow inmate noticed that

one of his wrists was swollen.  (Doc. 1 at 13).  Three days after the incident, another

inmate stated that both of the plaintiff's wrists were cut up and swollen.  (*Id.* at 12).

"Painful handcuffing, without more, is not excessive force in cases where the

resulting injuries are minimal." *Rodriguez v. Farrell* 280 F.3d 1341, 1351 (11th Cir.

2002); *Nolin v. Isbell*, 207 F.3d 1253, 1255, 1258 n. 4 (11th Cir. 2000) (finding that

minor bruising to wrists resulting from lawful arrest were *de minimis*, and could "not

defeat an officer's qualified immunity in an excessive force case"); *Gold v. City of

Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) (same in the context of skin abrasions).

The plaintiff's wrist injuries were minimal, and as such he has not show that there is

a genuine dispute with regard to this aspect of his excessive force claim against

defendant Johnson.  Accordingly, defendant Johnson's motion for summary judgment

is due to be granted as to this matter.

## B.     State Claims

### 1.     Intentional Infliction of Emotional Distress

In Alabama,

> a claim for intentional infliction of emotional distress [is] a tort
> commonly referred to as outrage. . . .

> Under Alabama law, a plaintiff pressing an outrage claim must
> prove three elements.  The first is "that the defendants either intended
> to inflict emotional distress, or knew or should have known that
> emotional distress was likely to result from their conduct." *Callens v.*

*Jefferson Cnty. Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000). The second is "that the defendants' conduct was extreme and outrageous." *Id.* And the third is "that the defendants' conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Id.*

Because the concept of "emotional distress" has hazy boundaries (to say the least), Alabama courts limit the circumstances in which a plaintiff can recover damages on an outrage claim. The three categories of viable outrage claims in Alabama are (1) wrongful conduct in the context of family burials, *see Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987) (holding jury question precluded summary judgment on outrage claim where defendant desecrated family burial ground of adjacent landowner); (2) insurance agents using heavy-handing tactics to force insureds to settle claims, see *Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983) (allowing outrage claim to go forward where insurance investigators threatened to kill plaintiff's two small sons, told plaintiff he would look good lying beside his dead brother, and drove plaintiff out into the woods at gun point and threatened to kill him); and (3) egregious sexual harassment, see *Busby v. Truswal Sys. Corp.*, 551 So. 2d 322 (Ala. 1989) (finding summary judgment improper where defendant made lewd sexual remarks to and gestures at female employees, touched the women inappropriately, and followed one of them home one night).

*Exford v. City of Montgomery*, 887 F. Supp. 2d 1210, 1229-1230 (M.D. Ala. 2012).

None of the plaintiff's allegations against the defendants fall within the type of behavior recognized as stating a viable claim of outrage under Alabama law. Accordingly, the defendants are entitled to summary judgment in their favor as to this claim.

### 2.      Negligent Infliction of Emotional Distress

An "independent tort action for negligently inflicted emotional distress . . . .

does not exist in Alabama." *AALAR, Ltd., Inc. v. Francis*, 716 So. 2d 1141, 1144

(Ala. 1998).  Instead, "negligently causing emotional distress . . . is part and parcel

of the traditional tort of negligence." *Id.*

> "'Negligence is usually characterized as an inattention,
> thoughtlessness, or heedlessness, a lack of due care.'" See, *Ex parte
> Anderson*, 682 So. 2d 467, 469-70 (Ala.1996) (reversing *Hughes v.
> Anderson*, 682 So. 2d 463 (Ala. Civ. App. 1995)) (quoting *Lynn
> Strickland Sales & Service, Inc. v. Aero-Lane Fabricators, Inc.*, 510 So.
> 2d 142, 145-46 (Ala.1987), overruled on other grounds, *Alfa Mut. Ins.
> Co. v. Roush*, 723 So. 2d 1250, 1252 (Ala. 1998)).  An intentional act,
> on the other hand, has been defined as follows:
>
>> "If the actor has intelligence enough to understand the
>> physical nature and consequences of his act, and . . .
>> consciously directs his action so that the injury of the
>> [plaintiff] is the natural or probable consequence thereof,
>> then that injury is the result of an intentional act."
>
> *Sutherland v. Roth*, 407 So. 2d 139, 140 (Ala. Civ. App. 1981).

*Woodley v. City of Jemison*, 770 So. 2d 1093, 1097 (Ala. Civ. App. 1999).

The acts defendant Johnson committed – striking the plaintiff in the mouth and

ribs five times – "are by their very nature intentional acts." (*Id.*).  So too is defendant

Miles's act of holding the plaintiff, thus effectively joining in on defendant Johnson's

assault by failing to stop Johnson's continued blows.

20

Additionally, the plaintiff did not claim defendants Johnson and Miles were 'negligent,' and "he cites no authority supporting the viability of a standalone negligence claim against the officers." *Exeter*, 887 F. Supp. 2d at 1231.  Moreover, the entirety of his claim consists of an assertion that "because of . . . the negligent infliction of emotional distress punitive damages should be awarded." (Doc. 1 at 9).

Even if Johnson did not exercise due care when he initially subdued the plaintiff and refused to loosen the plaintiff's handcuffs, these actions occurred during the course of a lawful arrest, which is "classified as [a] discretionary function[]." *Id.* (quoting *Telfare v. City of Huntsville*, 841 So. 2d 1222, 1228 (Ala. 2002)).  In Alabama, "state agents [are] immune from civil liability for conduct performed in "any discretionary function within the line and scope of his or her law enforcement duties." *Id.* (quoting Ala. Code § 6-5-338(a));  *Alabama Mun. Ins. Corp. v. Allen*, — So. 2d —, 2014 WL 4798918, * at 5 (Ala. 2014) (Sherriffs [and their deputies] are protected by State immunity under Ala. Const. 1901, art. I, § 14, and municipal peace officers are protected by State-agent immunity under the principles set out in *Ex parte Cranman*[.]").  The same logic would apply to defendant Miles, although the plaintiff's allegations against him do not establish facts showing his failure to intervene was the product of thoughtlessness or a lack of due care.

For all of the foregoing reasons, the defendants are entitled to summary

judgment as to this claim.

### 3.      Assault and Battery

Under Alabama law, assault and battery generally is an intentional tort. *Ex Parte International Refining & Mfg. Co.*, — So. 3d —, 2014 WL 2782148, at *4 (Ala. June 20, 2014); *Ex parte Capstone Bldg. Corp.*, 96 So. 3d 77, 83 (Ala. 2012); *Harper v. Winston County*, 892 So. 2d 346, 353 (Ala. 2004).

> "Assault" has been defined as "an *intentional*, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented." *Western Union Tel. Co. v. Hill*, 25 Ala. App. 540, 542, 150 So. 709, 710 (1933) (emphasis added) See also Wright v. Wright, 654 So. 2d 542, 544 (Ala. 1995). In a civil case, the elements of battery are: (1) that the defendant touched the plaintiff; (2) that the defendant *intended* to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner. *Ex parte Atmore Cmty. Hosp.*, 719 So. 2d 1190 (Ala.1998) (emphasis added). Our supreme court has explained that "'[a] battery consists in an injury actually *done to the person of another in an angry or revengeful* or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any *intentional violence* to the person of another.'" *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986) (quoting *Singer Mach. Co. v. Methvin*, 184 Ala. 554, 561, 63 So. 997, 1000 (1913) (emphasis added).

*Wood v. Cowart Enters., Inc.*, 809 So. 2d 835, 837 (Ala. Civ. App. 2001).

The plaintiff was lying handcuffed and compliant on the ground when defendant Johnson delivered five punches to his face and ribs. At the time, Officer

22

Miles was holding the plaintiff's neck. Witnesses attest that one officer held the plaintiff as another punched him while he was lying handcuffed on the ground and was not resisting. The plaintiff's two front teeth were knocked out and he sustained bruises to his ribs. Viewing the facts in a light most favorable to the plaintiff, a jury could find that the actions of Johnson and Miles were willful or malicious. In Alabama, an officer is not entitled to state-agent immunity under such circumstances. *Ex parte Butts*, 775 So. 2d 173, 178 (Ala. 2000) (citing *Ex parte Cranman*, 792 So. 2d 392 (Ala. 2000)). Accordingly, the motions for summary judgment filed by defendants Johns and Miles are due to be denied.

## V.  Recommendation

Accordingly, for the reasons stated above, the magistrate judge **RECOMMENDS** that the motion for summary judgment filed by defendant Johnson be **GRANTED IN PART** and **DENIED IN PART** as follows.

1.   Defendant Johnson's motion for summary judgment is due to be

   a.   **GRANTED** with regard to the Fourth Amendment claim that he pursued, initially took down, and subdued the plaintiff, and refused to loosen the plaintiff's handcuffs,

   b.   **GRANTED** with regard to the state law claims of intentional and negligent infliction of emotional distress,

   c.   **DENIED** with regard to the Fourth Amendment claim that he gratuitously punched the plaintiff in the face and ribs after the

plaintiff was compliant and prostrate on the ground, and

      d.    **DENIED** with regard to the state law claim of assault and battery.

Therefore, the plaintiff's Fourth Amendment excessive force claim against defendant Johnson is due to be **DISMISSED WITH PREJUDICE**, with the exception of the plaintiff's claim that defendant Johnson gratuitously punched him while he was laying compliant on the ground, and it should be **REFERRED** to the undersigned for additional proceedings.   Further, with the exception of the assault and battery claim, the state claims against defendant Johnson are due to be **DISMISSED WITH PREJUDICE**, and the assault and battery claim is due to be **REFERRED** to the undersigned for additional proceedings.

      2.    Defendant Miles's motion for summary judgment is due to be

      a.    **DENIED** with regard to the plaintiff's Fourth Amendment failure to intervene/excessive force claim against him, and his state law claim of assault and battery,

      b.    **DENIED** with regard to the state law claim of assault and battery, and

      c.    **GRANTED** with regard to the state law claims of intentional and negligent infliction of emotional distress.

Therefore, with the exception of Fourth Amendment failure to intervene/excessive force claim and the state law assault and battery claim, all claims against defendant Miles are due to be **DISMISSED WITH PREJUDICE**.   The

24

Fourth Amendment failure to intervene/excessive force claim and the state law assault and battery claim against defendant Miles are due to be **REFERRED** to the undersigned for additional proceedings.

## VI. Notice of Right to Object

Any party who objects to this report and recommendation must, within fourteen (14) days of the date on which it is entered, file specific written objections with the clerk of this court. **Any objections to the failure of the magistrate judge to address any contention raised in the petition also must be included.** Failure to do so will bar any later challenge or review of the factual findings **or legal conclusions** of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140 (1985); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (*en banc*). In order to challenge the findings of the magistrate judge, a party must file with the clerk of the court written objections which shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection. A copy of the objections must be served upon all other parties to the action.

Upon receipt of objections meeting the specificity requirement set out above, a United States District Judge shall make a *de novo* determination of those portions of the report, proposed findings, or recommendation to which objection is made and

may accept, reject, or modify in whole or in part, the findings or recommendations made by the magistrate judge. The district judge, however, need conduct a hearing only in his discretion or if required by law, and may consider the record developed before the magistrate judge, making his own determination on the basis of that record. The district judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Objections not meeting the specificity requirement set out above will not be considered by a district judge.

A party may not appeal a magistrate judge's recommendation directly to the United States Court of Appeals for the Eleventh Circuit. Appeals may be made only from a final judgment entered by or at the direction of a district judge.

The Clerk is DIRECTED to serve a copy of this report and recommendation upon the plaintiff and counsel for the defendant.

**DATED**, this 4th day of February, 2015.

_John E. Ott_

**JOHN E. OTT**
Chief United States Magistrate Judge

26